## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ESTATE OF JUANITA JACKSON,
ESTATE OF ELVIRA NUNZIATA,
ESTATE OF JOSEPH WEBB, ESTATE
OF ARLENE TOWNSEND, ESTATE OF
OPAL LEE SASSER, and ESTATE OF
JAMES HENRY JONES,

        Appellants,

v.                                       Case No: 8:16-cv-22-T-17

RUBIN SCHRON,

        Appellee.

_____

## ORDER

      This cause comes before the Court pursuant to the appeal filed by Appellants, the

Estate of Juanita Jackson, *et al.* (the "**Appellants**" or the "**Probate Estates**"), of orders

entered by the United States Bankruptcy Court for the Middle District of Florida (the

"**Bankruptcy Court**") enjoining the Appellants from pursuing claims against the Appellee,

Rubin Schron (the "**Appellee**" or "**Schron**"), in state court, and dismissing the Appellants'

claims against Schron in Adversary Proceeding 8:13-ap-00893-MGW (the "**Adversary**

**Proceeding**").  The Court has for consideration the Appellants' initial brief (Doc. No. 41)

(the "**Appellants' Brief**"), the Appellants' supplemental briefs (Doc. Nos. 48-54), the

Appellee's response brief (Doc. No. 57) (the "**Appellee's Brief**"), the Appellants' reply

brief (Doc. No. 60), and the Appellants' supplemental reply briefs (Doc. Nos. 61-66).  For

the reasons set forth below, the Bankruptcy Court's orders are **AFFIRMED**.

## I.   Introduction

The primary issues in this appeal are (1) whether the Bankruptcy Court had subject matter jurisdiction to enjoin state court proceedings between the Appellants and Schron; (2) whether the Bankruptcy Court had authority to issue such an injunction under the All Writs Act; and (3) whether the Bankruptcy Court erred in dismissing the Appellants' fraudulent transfer, alter ego, aiding and abetting, and abuse of process claims against Schron with prejudice.

With respect to the first issue, the Appellants argue that the Bankruptcy Court lacked subject matter jurisdiction to enjoin the Probate Estates from pursuing non-bankruptcy litigation against Schron. This argument suffers from two fatal flaws. First, the Appellants' argument ignores that the theories of recovery asserted against Schron in state court are identical to the theories of recovery that were asserted against Schron in this Adversary Proceeding. Thus, any determination regarding the merits of the Probate Estates' claims in state court could affect the administration of the parallel claims being asserted before the Bankruptcy Court. Second, the Appellants ignore that they filed the involuntary bankruptcy case that created the Bankruptcy Court's jurisdiction in the first instance. Having utilized the powers of the Bankruptcy Court and the Bankruptcy Code to assist in the collection of their judgments, the Appellants' argument that the Bankruptcy Court lacked jurisdiction to effectuate its orders reeks of gamesmanship. For these reasons, the Probate Estates' jurisdictional arguments are without merit.

As to the second issue, the Appellants argue that the Bankruptcy Court deprived them of due process by issuing its injunctions under the All Writs Act, rather than using the standard set forth under Federal Rule of Civil Procedure 65. A close review of the Eleventh Circuit's caselaw interpreting the All Writs Act negates this argument. In fact,

the Eleventh Circuit has clearly stated that injunctions issued under the All Writs Act need not comply with the four prong test for issuing preliminary injunctions under Rule 65.  To the contrary, a court has authority under the All Writs Act to enter any order necessary to effectuate its judgments.  Having entered judgment in favor of Schron and against the Appellants in this Adversary Proceeding, the Bankruptcy Court was authorized to issue its permanent injunction barring parallel state court litigation under the All Writs Act.

Finally, with respect to the sufficiency of the Appellants' pleadings, this Court is satisfied that the operative pleadings before the Bankruptcy Court do not state a claim against Schron under any legal theory.  The Court's conclusion in this regard is based on two separate considerations.  First, at a high level, the Appellants' pleadings are excessively voluminous, confusing, and redundant and, as a result, do not comply with Rule 8.  Second, from a more technical perspective, the Appellants' pleadings lack specific allegations of misconduct against Schron, and where specific allegations are made, fail to state a claim upon which relief can be granted.  For these reasons, the Bankruptcy Court acted properly in dismissing the Appellants' claims against Schron.

## II.    Background

The Probate Estates represent the interests of six deceased nursing home residents who allegedly died as a result of nursing home neglect and other related misconduct.    Trans Healthcare, Inc. ("**THI**") was an owner of, and Trans Health Management, Inc. ("**THMI**") provided back-office management services to, nursing homes located throughout the United States.  More than a decade ago, the Probate Estates commenced wrongful death litigation against THMI and THI in Florida and Pennsylvania state courts. (Doc. No. 67-2, at 2; Appellants' Brief, at 5).  The Probate Estates ultimately

obtained "empty chair" judgments against THMI and THI totaling more than $1 billion. (Doc. No. 67-2, at 2; Appellants' Brief, at 7).

### A.    The March 2006 Transfers

After obtaining judgments against THI and THMI, the Appellants learned that during March 2006, THMI --- purportedly at the behest of Schron, Schron's former investment banker, Murray Forman ("**Forman**"), and Schron's former lawyer, Leonard Grunstein ("**Grunstein**"), among others --- engaged in a series of fraudulent transfers intended to frustrate the Probate Estates' collection efforts (the "**March 2006 Transfers**") (Appellants' Brief, at 5-8).   In particular, the Appellants contend that as a result of the March 2006 Transfers, THMI's assets were transferred to a newly created entity, Fundamental Long Care Holdings, LLC ("**FLTCH**"), while its liabilities were transferred to a separate entity, Fundamental Long Term Care, Inc. ("**FLTCI**"). (Appellants' Brief, at 6-7).   Moreover, the Appellants claim that at the direction of Schron, Grunstein, Forman, and others, THI was allowed to slowly go out of business, and was ultimately placed into receivership in Maryland in 2009. (Appellants' Brief, at 7).   The cumulative effect of the foregoing, according to the Appellants, is that the Probate Estates were left with judgments against defunct, liability-ridden shell companies, while the Appellee, along with Grunstein, Forman, and others, were able to continue to operate their nursing home empire free from liability. (Doc. No. 40-3, at 2).

### B.    The Bankruptcy Case

After learning of the March 2006 Transfers, the Probate Estates filed an involuntary petition under chapter 7 of the Bankruptcy Code against FLTCI on December 2, 2011. (Appellants' Brief, at 8).   Beth Ann Scharrer ("**Scharrer**" or the "**Trustee**") was appointed as Chapter 7 Trustee for the estate of FLTCI.  Using the powers afforded to her under the

4

Bankruptcy Code, Scharrer joined forces with the Probate Estates to investigate and work-up claims against FLTCH, Schron, Grunstein, Forman, and others related to the March 2006 Transfers. (Appellee's Brief, at 8; Doc. No. 40-11, at 4-5).  The purpose of the Trustee's investigation was, of course, to recover funds on behalf of FLTCI's creditors, i.e. the Probate Estates, which could be used to satisfy FLTCI's outstanding liabilities, i.e. the Probate Estates' judgments. (Appellee's Brief, at 8; Doc. No. 40-11, at 5).  Thus, from this perspective, the Probate Estates and the Trustee's interests were closely aligned.

Nevertheless, despite availing themselves of the Trustee's broad powers to investigate and work-up claims under the Bankruptcy Code, the Probate Estates were not altogether satisfied with taking a back seat to the Trustee's investigation. (Doc. No. 40-11, at 7).  In fact, while the Trustee was performing her investigation, the Probate Estates continued their efforts to obtain judgments against Schron, Grunstein, Forman, and others in various, still-pending state court proceedings. (Appellee's Brief, at 8; Doc. No. 40-11, at 7).  Further complicating matters, two of the Probate Estates' targets got "a little proactive" themselves, and filed a declaratory judgment action in federal district court in New York, seeking a determination that they were not liable for any alter ego or fraudulent transfer claims, or alternatively, that the statutes of limitations for those claims had expired. (Doc. No. 40-11, at 5-6).

C.    The Preliminary Injunction

Faced with this seemingly ever-expanding specter of litigation, the Bankruptcy Court enjoined the New York declaratory judgment action and ordered the Trustee to bring any alter ego and fraudulent transfer claims related to the March 2006 Transfers in a single adversary proceeding. (Doc. No. 40-11, at 6).  The Bankruptcy Court justified its authority to do so based on its exclusive jurisdiction over any proceeding affecting

5

property of the estate, as well as its jurisdiction over any matter that could affect the administration of FLTCI's estate. (Doc. No. 40-11, at 2). This jurisdiction, according to the Bankruptcy Court, necessarily extended to any avoidance actions belonging to THMI because any such claims were property of FLTCI's estate. (Doc. No. 40-11, at 2). As to non-debtor "targets" such as Schron, Grunstein, and Forman, the Bankruptcy Court based its jurisdiction on the fact that "continuation of the state-court proceedings supplementary unnecessarily interferes with the Trustee's administration of this estate because the claims being pursued by the creditors are virtually identical to the claims belonging to this estate." (Doc. No. 40-11, at 2).

D.    The Adversary Proceeding

On January 31, 2014, the Probate Estates together with the Trustee filed an amended complaint (Doc. No. 40-2) (the "**FAC**") through which they asserted a total of 21 counts against 16 defendants, including Schron. (Appellants' Brief, at 11). The FAC was 228 pages long and contained 1201 paragraphs of allegations. (Doc. No. 40-2). The defendants responded by filing motions to dismiss, and on March 14, 2014, the Bankruptcy Court entered an order dismissing the amended complaint without prejudice. (Doc. No. 40-4). In its order, the Bankruptcy Court ordered the Probate Estates to correct numerous pleading deficiencies, including their failure to specify Schron's role in the alleged "bust out" scheme --- other than through conclusory allegations that Forman and Grunstein acted as Schron's agents. (Doc. No. 40-4, at 28). The Probate Estates filed a *Second Amended Complaint* (Doc. No. 40-1) (the "**SAC**") on April 4, 2014. The SAC picks up where the FAC left off --- literally --- by incorporating the "good" portions of the FAC into the SAC, and adding an additional 412 paragraphs of "new" allegations spanning an additional 64 pages. (Doc. No. 40-1). Combined, the FAC and SAC total

292 pages and 1613 allegations. (Doc. Nos. 40-1 & 40-2).  On April 25, 2014, Schron moved to dismiss the SAC for failure to state a claim. (Doc. No. 41-5).  The Bankruptcy Court agreed with Schron's arguments, and dismissed each of the Probate Estates' claims against Schron with prejudice. (Doc. No. 40-3).

### E.    The Settlement and Permanent Injunction

Following Schron's dismissal, the Adversary Proceeding continued as to the remaining defendants.  The Bankruptcy Court ultimately conducted a bench trial in the Adversary Proceeding, at the conclusion of which it announced preliminary findings of fact and conclusions of law.  Before the Bankruptcy Court finalized its findings, however, the remaining parties resolved their claims through a post-trial mediation, which resulted in proceeds of approximately $24 million for the Probate Estates and Trustee. (Doc. No. 38-4, at 2).  Nevertheless, despite this settlement, the Probate Estates were not willing to relinquish their claims against Schron that had been pending before the various state courts.  Thus, the Bankruptcy Court entered a permanent injunction enjoining any further litigation against Schron "arising out of the nucleus of facts set forth in the [Adversary Proceeding]." (Doc. No. 40-16).  The Probate Estates appeal from the entry of that order, as well as from the Bankruptcy Court's order dismissing their claims against Schron with prejudice.

### III.   Discussion

The Probate Estates argue that the Bankruptcy Court's orders should be reversed for the following reasons.  First, with respect to the permanent injunction, the Probate Estates contend that the Bankruptcy Court lacked subject matter jurisdiction to enjoin non-bankruptcy litigation, i.e. the pending state court lawsuits, between non-debtors, i.e. the Probate Estates and Schron.  Second, the Probate Estates argue that even to the

extent that the Bankruptcy Court had subject matter jurisdiction to enter its injunction, it deprived the Probate Estates of due process by doing so without applying the familiar four prong test used for issuing injunctions under Federal Rule of Civil Procedure 65. Third, as to the merits of their claims against Schron, the Probate Estates argue that the Bankruptcy Court erred by dismissing the SAC as to Schron without leave to amend. Finally, the Probate Estates argue that the Bankruptcy Court deprived the Probate Estates of their right to a jury trial. Each of these arguments is addressed in turn.

### A.    Jurisdiction

The bankruptcy jurisdictional statute, 28 U.S.C. § 1334, states that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §§ 1334(a) & (b). Section 1334(e) goes on to state that "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1). The United States District Court for the Middle District of Florida, along with the other district courts in the country, has referred all cases within the scope of 28 U.S.C. § 1334 to "the bankruptcy judges for this district." *See* Amended Order of Reference, 6:12-mc-26-ORL-22 (Feb. 2, 2012).

Read together, Sections 1334(a) & (b) grant "bankruptcy courts subject matter jurisdiction over four types of matters: (1) the bankruptcy case itself, (2) proceedings that arise under title 11, (3) proceedings that arise in a case under title 11, and (4) proceedings otherwise related to a case under title 11." *Golf Club at Bridgewater, L.L.C. v. Whitney Bank*, 2013 WL 1193182, at *2 (M.D. Fla. Mar. 22, 2013) (citing *Wood v. Wood (In re*

*Wood), 825 F.2d 90, 92 (5th Cir.1987)). Importantly, for a bankruptcy court to have subject matter jurisdiction over a dispute, the proceeding need only fall within the bankruptcy court's "related to" jurisdiction. *Id.* "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id.* (citing *Pacor, Inc. v. Higgins (In re Pacor, Inc.),* 743 F.2d 984, 994 (3d Cir.1984) (emphasis in original)). Under this standard, "[t]he proceeding need not necessarily be against the debtor or against the debtor's property" to fall within the court's "related to" jurisdiction. *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.),* 910 F.2d 784, 788 (11th Cir. 1990).

Here, the Appellants' claims against Schron all trace their origins to the March 2006 Transfers. This fact dooms the Appellants' jurisdictional arguments for a number of reasons. First, the Appellants' decision to place FLTCI into bankruptcy, coupled with the substantive consolidation of THMI with FLTCI's estate (Doc. No. 18-161), made any claims that could be asserted by FLTCI and/or THMI's creditors property of the estate. This includes any claims related to the March 2006 Transfers. In fact, it appears that the Appellants' desire to pursue claims related to the March 2006 Transfers was the primary (if not sole) reason for placing FLTCI into bankruptcy in the first place. Thus, the Bankruptcy Court necessarily had subject matter jurisdiction, under Section 1334(e), over any claims against Schron that belonged to the FLTCI estate. Second, any analogous claims related to THI's involvement in the March 2006 Transfers are also necessarily related to bankruptcy under Section 1334(b). This is because any determination regarding the merits of those claims would impact the validity of the FLTCI estate's claims,

as they all trace their origins to the March 2006 Transfers.  For instance, a determination that the March 2006 Transfers were not fraudulent as to THI and/or FLTCH could undermine the FLTCI estate's claims related to the March 2006 Transfers.  In light of the foregoing, the Court is satisfied that the Bankruptcy Court had subject matter jurisdiction over the claims asserted in the Adversary Proceeding.

Moreover, while not necessarily dispositive of the issue, it bears mentioning that this case began as an involuntary bankruptcy case filed by the Appellants.  Having put the Debtors into bankruptcy, and used the provisions of title 11 to investigate and work-up their claims against Schron and numerous other third-party targets, the Appellants now argue that the Bankruptcy Court lacked jurisdiction to enter orders affecting one of its targets.  The Appellants cannot have their cake and eat it too.  The Appellants filed the involuntary case to collect on judgments against THI and THMI.  In so doing, they availed themselves of the "tools" provided by title 11, i.e. they obtained appointment of a chapter 7 trustee, who in turn conducted Rule 2004 examinations, filed adversary proceedings, and together with the Trustee, recovered settlements totaling approximately $24 million. Undoubtedly, if the Bankruptcy Court had ruled that Schron was liable to the FLTCI estate (and by extension, the Appellants), they would hardly be challenging its jurisdiction to enforce that order.  Viewed from this perspective, the Appellants' jurisdictional arguments are not well-taken.

### B.     Due Process

"There are at least three different types of injunctions a federal court may issue." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).  "The first is a 'traditional' injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights." *Id.* "The second type

of injunction a court may issue is a 'statutory injunction.'" *Id.* at 1098.   "A statutory injunction is available when a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute." *Id.*   "The final type of injunction is an injunction under 28 U.S.C. § 1651(a), the All Writs Act." *Id.* at 1099. Under the All Writs Act, courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *Id.*

"The [All Writs] Act does not create any substantive federal jurisdiction,"[1] rather "it is a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source." *Id.*   "In allowing courts to protect their 'respective jurisdictions,' the Act allows them to safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." *Id.*   "A court may grant a writ under this act whenever it is 'calculated in the court's sound judgment to achieve the ends of justice entrusted to it,' and not only when it is 'necessary' in the sense that the court could not otherwise physically discharge its duties." *Id.* at 1100.   Importantly, *"[t]he requirements for a traditional injunction do not apply to injunctions under the All Writs Act* because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns." *Id.* (emphasis added).

"Regarding pending proceedings, a court may enjoin almost any conduct 'which left unchecked, would have the practical effect of diminishing the court's power to bring

---

[1] Where, as here, bankruptcy court jurisdiction is appropriate, bankruptcy courts have authority to issue injunctions in aid of their jurisdiction under the All Writs Act and Section 105 of the Bankruptcy Code. *See Alderwoods Grp. v. Garcia*, 682 F.3d 958, 972 n. 24 (11th Cir. 2012).

the litigation to a natural conclusion.'" *Id.* at 1102. However, as an exception to this rule, a court ordinarily may not "enjoin state court proceedings to protect its ability to render judgment in ongoing *in personam* proceedings." *Id.* Nevertheless, "this prohibition against enjoining state courts does not apply where a district court is seeking to protect the integrity or enforceability of existing judgments or orders, rather than its ability to prospectively issue one in a pending case." *Id.* at 1104. "Proceedings in other courts that involve the same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction." *Id.*

Here, the Bankruptcy Court's injunction clearly seeks to protect the integrity or enforceability of its existing orders, i.e. its order dismissing the Bankruptcy Estates' claims against Schron, as well as the settlement agreement between the Probate Estates, the Trustee, and the remaining defendants. Moreover, the Appellants' state court proceedings against Schron necessarily involve the same facts underlying the Bankruptcy Court's orders, i.e. the March 2006 Transfers. Thus, absent the Bankruptcy Court's injunction, there is a risk that a state court could make determinations regarding Schron's liability related to the March 2006 Transfers that are inconsistent with the Bankruptcy Court's rulings in the Adversary Proceeding. This is precisely the scenario that the All Writs Act is intended to prevent from occurring. Accordingly, the Bankruptcy Court did not abuse its discretion by enjoining the Appellants from continuing to pursue state court proceedings against Schron arising out of the nucleus of facts set forth in the Adversary Proceeding.

### C.    Sufficiency of the Complaint

"We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." *Moseley v. Carnival Corp.*, 593 F. App'x 890, 892 (11th Cir. 2014).   "We review a [bankruptcy] court's decision whether to grant leave to amend for an abuse of discretion." *Id.*

To state a claim for relief under Federal Rule of Civil Procedure 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).   "Each allegation must be simple, concise, and direct." FED. R. CIV. P. 8(d)(1).   Here, the operative complaints total nearly 300 pages and encompass more than 1600 paragraphs of allegations.   The Bankruptcy Court dismissed those complaints as to one defendant, Schron, at the pleadings stage, for failure to state a claim.   The Appellants contend that this was in error, and in support cite numerous paragraphs from the operative complaints that they contend were either ignored or overlooked by the Bankruptcy Court in reaching its conclusion.

Upon review, the Appellants' arguments are not well-taken.   The operative complaints do not even come close to complying with the requirements of Rule 8.   There is no "short and plain statement of the claim."   There is, instead, a sprawling, rambling, and oppressively voluminous "kitchen sink" of allegations spanning the better part of the last two decades and accusing virtually anyone who came in contact with the subject nursing homes of various, hyperbolic forms of misconduct.   If these complaints had been filed in this Court, they would have been struck, *sua sponte*, for being redundant, immaterial, and impertinent.   The Bankruptcy Court's willingness to consider these

complaints in the first instance, much less supervise this case through to a trial on the merits, went above and beyond the call of duty.

This is not to say that this Court has failed to analyze the sufficiency of the Appellants' claims --- it has --- and as to Schron, by any reasonable measure, no such claims exist.   In fact, despite the millions of dollars in fees that have been incurred "investigating" and "working-up" the claims against Schron, this Court is unaware of any colorable basis for holding Schron liable, under any legal theory, for the debts of THMI, FLTCI, or THI.  The Court's analysis follows.

### 1.    *Fraudulent Transfer Claims*

The hallmark of a constructively fraudulent conveyance is the transfer of property, or the incurrence of an obligation, for less than reasonably equivalent value, at a time when the transferor was insolvent, or became insolvent as a result of the transfer or the incurrence of the obligation. *See* 11 U.S.C. § 548(a)(B) (2012); *see also* Fla. Stat., § 726.105(1)(b) (2016).   Here, the primary issue on appeal involves whether the Probate Estates adequately alleged the March 2006 Transfers were made for less than reasonably equivalent value.   In their brief, the Appellants primarily argue that the SAC contains sufficient allegations of a constructively fraudulent transfer based on allegations that (1) the March 2006 Transfers left FLTCI a "liability ridden shell company," (2) at the time of the March 2006 Transfers, the "THI Enterprise" had an enterprise value of more than $180 million, yet was sold for less than $10 million; and (3) THI sold a legal malpractice claim worth up to $2 billion for only $700,000.00.   For the reasons set forth below, these allegations do not plausibly state a claim against Schron for a constructively fraudulent transfer.

As an initial matter, the Probate Estates' allegation that the March 2006 Transfers left THMI (and later, FLTCI) a "liability ridden shell company" is not legally significant.  In fact, if THMI had significant tort liability and negligible assets prior to the March 2006 Transfers, why would the Appellants have expected it to be anything other than a "liability ridden shell company" after those transfers?  The same holds true for THI.  In the SAC, the Appellants allege that the assets of THI and THMI were worth in excess of $100 million prior to the March 2006 Transfers, based on an enterprise valuation by Lancaster Group, LLC of more than $183 million. (SAC, at ¶ 1515).  This is the only allegation in Count XXX of the SAC regarding the purported value, if any, of THI and THMI prior to the March 2006 Transfers.  Notably, in basing their fraudulent transfer claim on this allegation, the Appellants demonstrate a fundamental misunderstanding of the concept of enterprise valuation.

Enterprise value is not the same thing as asset value.  Far from it, enterprise value is the market value of a company's equity; *plus* its debt; *less* its cash and investments. *See* http://www.investopedia.com/ terms/e/enterprisevalue.asp (last visited August 25, 2016).  Enterprise value is useful for quantifying what a buyer would have to pay to acquire a company, since in the event of a buyout, the acquirer also has to take on the company's debt obligations. *Id.*  Viewed in this context, it is entirely possible for a company with a large enterprise value to have little to no asset value.  Thus, the fact that THI and THMI were sold for $9.9 million, when they had an enterprise value of $183 million, does not mean the buyers benefited to the tune of $170 million, as alleged in the SAC. (SAC, at ¶¶ 1516-1518).  Sure, THI and THMI could have been sold for less than reasonably equivalent value, given a purchase price of $9.9 million compared to an

enterprise value of more than $100 million. On the other hand, $9.9 million could have been a fair --- or even charitable --- price to pay for THI and THMI if their enterprise value consisted almost entirely of debt. Viewed in the proper context, these allegations plead "facts that are 'merely consistent with' a defendant's liability," and as a result the SAC "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, the Bankruptcy Court was correct to dismiss the Appellants' fraudulent transfer claims based on the March 2006 Transfers.

This appeal is even more dubious as it relates to the fraudulent transfer claims based on the sale of the legal malpractice claim that occurred during January 2012 (the "**January 2012 Transfers**"). The Appellants allege, in a vacuum, that Schron purchased claims and causes of action with a "*potential* value of approximately $2 billion" for only $700,000.00. (SAC, at ¶ 1544 -1548). These claims apparently consisted, in large part, of legal malpractice claims owned by THI based on its attorneys' failure to prevent the "THI Enterprise" from incurring over $1 billion in "empty chair" judgments. (SAC, at ¶ 1548). As the Bankruptcy Court observed, while this theory may have some superficial appeal, the *potential* malpractice claims were not plausibly worth $1-2 billion. Even more fundamentally, however, the claims based on the January 2012 Transfers presuppose that THI was capable of assigning its legal malpractice claims in the first instance. This is incorrect. Legal malpractice claims are non-assignable personal tort claims. *See Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 760 (11th Cir. 1996). Thus, regardless of the potential value, if any, of the legal malpractice claims, THI had no authority to transfer its legal malpractice claims to Schron. Accordingly, to the extent that Schron paid $700,000.00 for non-assignable claims, he got a very bad deal, and at best,

the transfer was ineffective.  Under either scenario, the Appellants fail to state a claim for a constructively fraudulent transfer and, as a result, the Bankruptcy Court was correct to dismiss the fraudulent transfer claim with prejudice.

*2.*   *Alter Ego, Aiding and Abetting Breach of Fiduciary Duty*

To impose alter ego liability against a party, the plaintiff must establish the following three elements: (1) that the person dominated and controlled the corporation; (2) the corporate form was used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the plaintiff. *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468-69 (Bankr. M.D. Fla. 1994).  Here, the Probate Estates argue that the SAC contained sufficient factual allegations of a principal/agent relationship between Schron, on the one hand, and Grunstein and Forman, on the other, to state a claim for alter ego liability against Schron.  This argument necessarily fails, however, because the Bankruptcy Court also dismissed the Probate Estates' alter ego claims against Grunstein and Forman for failure to state a claim.  Thus, even if the SAC contained sufficient allegations of an agency relationship between Schron, Grunstein, and Forman, the alter ego claim must necessarily be dismissed as to Schron, if dismissal was proper as to Grunstein and Forman.

On this point, the Bankruptcy Court determined that the Probate Estates failed to allege facts sufficient to state a claim against Grunstein and Forman with respect to the third element for imposing alter ego liability: that the fraudulent or improper use of the form caused the creditor's injury.  In so doing, the Bankruptcy Court used a hypothetical to illustrate that if Grunstein and Forman had set up FLTCI for a legitimate purpose, but then fraudulently transferred its assets to FLTCH, the Probate Estates' loss would have

been the same as if FLTCI were set up for an improper purpose, i.e. there would have been insufficient assets to satisfy the Probate Estates' judgments.  Since under either scenario the Probate Estates' loss would have been caused by the fraudulent transfer of THMI's assets, not by the improper use of the corporate form, the Bankruptcy Court reasoned that a claim for fraudulent transfer --- not alter ego liability --- was the proper means of redressing Grunstein and Forman's alleged wrongdoings.

Upon review, this Court agrees with the Bankruptcy Court's reasoning.  Under Florida law, "[c]ausation consists of two distinct subelements: (1) the cause in fact, and (2) proximate cause." *50 State Sec. Serv., Inc. v. Giagrandi*, 132 So.3d 1128, 1149 (Fla. 3d DCA 2013).   "[C]ausation-in-fact requires proof that 'but for' the defendant's negligence, the harm would not have occurred." *Id.*; *see also IBP, Inc. v. Hady Enters., Inc.*, 267 F.Supp.2d 1148, 1162 (N.D. Fla. 2002) ("To determine whether cause in fact exists, Florida courts generally follow the but for test: whether there is such a natural, direct, and continuous sequence between the negligence . . . and the plaintiff's injury that it can reasonably be said that *but for* the negligent act or omission the injury would not have occurred." (emphasis in original)).  As the Bankruptcy Court's hypothetical makes clear, taking the facts alleged in the SAC as true, the Probate Estates' loss would not have occurred "but for" the allegedly improper use of the corporate form.  To the contrary, the Probate Estates' loss occurred because of an alleged fraudulent transfer, separate and apart from any improper use of the corporate form by Grunstein and Forman.  Thus, the Bankruptcy Court was correct to dismiss the Probate Estates' alter ego claims against Schron, Grunstein, and Forman with prejudice.

With regard to the Probate Estates' aiding and abetting claim against Schron, the Bankruptcy Court dismissed that claim due to the Probate Estates' failure to plead that Schron committed any acts individually, or that Grunstein and Forman committed unlawful acts as Schron's agents.  In so doing, the Bankruptcy Court observed that many of the Probate Estates' allegations regarding the relationship between Schron, Grunstein, and Forman were lifted from a lawsuit Schron filed against Grunstein and Forman accusing them of *breaching* their fiduciary duties to him.  Given this fairly obvious divergence of interest between Schron, on the one hand, and Grunstein and Forman, on the other, the Bankruptcy Court was correct in dismissing the Probate Estates' aiding and abetting claim against Schron.

In arguing to the contrary, the Probate Estates lose track of the fact that in evaluating the sufficiency of a complaint, the Court is required to *take the plaintiff's allegations as true*, and then consider whether those allegations plausibly give rise to a claim for relief.  Taking the Probate Estates' allegations that Grunstein and Forman violated their fiduciary duties to Schron, the Appellants fail to state a plausible claim against Schron based on an agency theory.  This is so in spite of the conflicting allegations in the SAC that Grunstein and Forman acted as Schron's agents.  The Court simply cannot take both competing circumstances as true and find a plausible claim for aiding and abetting based on an agency theory.  Notably, these pleading defects are entirely of the Appellants' making.  The Appellants had no obligation to allege or incorporate facts taken from Schron's lawsuit against Forman and Grunstein.  To the contrary, the necessarily allegations could have been pled without reference to that lawsuit.  Viewed in this context, the Appellants' decision to file a 300 page, 1600 allegation complaint has a

rather obvious downside: it makes it difficult to keep one's allegations consistent.  Given the conflicting allegations in the SAC, the Bankruptcy Court was correct to dismiss the aiding and abetting claim with prejudice.[2]

### 3. Abuse of Process, Conspiracy to Commit Abuse of Process

"Abuse of process involves the use of criminal or civil legal process against another primarily to accomplish a purpose for which it was not designed." *Bothmann v. Harrington*, 458 So.2d 1163, 1169 (Fla. 3d DCA 1984).  "For the cause of action to exist there must be a use of the process for an *immediate purpose* other than that for which it was designed." *Id.* (emphasis in original).  "There is no abuse of process, however, when the process is used to accomplish the result for which it was created, regardless of an incidental or concurrent motive of spite or ulterior purpose." *Id.*  "[T]he gravamen of this tort is the *misuse* of process, in a manner often resembling extortion." *MacNeill v. Yates*, 2009 WL 2449256, at *2 (M.D. Fla. Aug. 7, 2009) (emphasis in original).  As noted in *MacNeil*, the critical inquiry is whether the process is being used "to accomplish the result for which it was created." *Id.*  For example, using a subpoena to bully the other side into a settlement constitutes an abuse of process; whereas using a subpoena to obtain evidence does not. *Id.*

Here, the Probate Estates allege that Schron and the other defendants committed an abuse of process by asserting unauthorized defenses on behalf of THMI in order to advance their own interests.  Specifically, the Probate Estates allege that "the Defendants used the [January 2012] Agreement to do precisely what the Court said the [January 2012] Agreement did not allow them to do --- namely, present a defense in the name of

---

[2] This analysis applies equally to the Probate Estates' alter ego claim, to the extent that it is determined that the claim was improperly dismissed as to Grunstein and Forman.

THMI, and advance litigation positions on THMI's behalf." (SAC, at ¶ 1438).  "Because no rights were transferred pursuant to the [January 2012] Agreement . . . the presentation of a defense on THMI's behalf by the Defendants was unauthorized, improper and contrary to law." (SAC, at ¶ 1439).  In making this allegation, the Plaintiffs confuse and conflate the execution of the January 2012 Agreement with the actual defense of THMI in the state court proceedings.  The January 2012 Agreement did not, in and of itself, constitute a "use of criminal or civil process" --- it was simply an agreement, i.e. a contract, between interested parties.  Thus, the fact that the January 2012 Agreement --- and by extension the defense of THMI --- may have been unauthorized is irrelevant to whether there was an abuse of process.

Viewed from this perspective, the only "use of criminal or civil process" that could have constituted an abuse of process was Schron and the other defendants' presentation of a defense in the name of THMI in the state court actions.  Importantly, this use of process, i.e. the presentation of a defense on behalf of THMI, is alleged to have occurred *in actions against THMI*.  Regardless of any nefarious master plan by Schron and the other defendants, the only immediate impact of the presentation of a defense on behalf of THMI in the state court actions was to defend THMI.  This is precisely the result for which such process was created and intended to achieve.  The only way in which the presentation of such a defense could constitute an abuse of process is if the immediate purpose of the defense benefited Schron and the other defendants, as opposed to THMI. This could occur if, as the Bankruptcy Court pointed out, Schron and the other defendants presented a defense on behalf of THMI solely to delay the litigation to facilitate the expiration of applicable statutes of limitations for claims against themselves.  Under those

circumstances, the immediate purpose of the process would have been to benefit Schron and the other defendants, not THMI.  Here, on the other hand, the immediate purpose of the defense was to benefit THMI.  The fact that a successful defense of THMI would also benefit Schron and the other defendants does not convert their unauthorized defense of THMI into an abuse of process.  Thus, the Bankruptcy Court's dismissal of the abuse of process claims with prejudice was correct.[3]

## IV.  Conclusion

Accordingly, it is

**ORDERED** that the Bankruptcy Court's orders are **AFFIRMED**.  The Clerk of Court is directed to enter judgment for the Appellee and against the Appellants, and to close this case.

It is further **ORDERED** that pursuant to Bankruptcy Rule 8024, upon entry of judgment, the Clerk is directed to immediately transmit a notice of the entry to each party, to the United States trustee, if any, and to the bankruptcy clerk, together with a copy of this order.  The Clerk shall immediately note the date of such transmission on the docket.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 8th day of September, 2016.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[3] Having correctly dismissed the Appellants' claims against Schron, the Court need not consider whether the Probate Estates were deprived of any right to a jury trial.